# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | | |
|---|---|---|
| United States of America<br>v.<br><br>JULIO ADRIAN JIMENEZ SEVILLA<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>2:19-MJ-0 0 0 8 7 |

**SEALED FILED MAY 31 2019 CLERK, U.S. DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA BY DEPUTY CLERK**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   October 26, 2016   in the county of   Sacramento   in the
Eastern   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with the intent to distribute controlled substances. |
| 18 U.S.C. § 922(g) | Possession of a firearm or ammunition. |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

*Complainant's signature*

Russell Custer, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5-31-19

*Judge's signature*

City and state:   Sacramento, California   Deborah Barnes, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF FBI SPECIAL AGENT RUSSELL CUSTER

I, Russell Custer, being duly sworn, hereby depose and state:

## PURPOSE

1. This Affidavit is made in support of a complaint and arrest warrant for Julio Adrian Jimenez SEVILLA, hereinafter SEVILLA. As detailed below, I believe there is probable cause to believe that SEVILLA has committed violations of 21 U.S.C. § 841(a)(1) possession with intent to distribute controlled substances, and 18 U.S.C. § 922(g) possession of a firearm or ammunition by a prohibited person in the Eastern District of California.

## AGENT BACKGROUND

2. I am a Special Agent with the FBI. I entered on duty at the FBI Academy in Quantico, Virginia on October 24, 2010. I am currently assigned to the FBI's Sacramento Division, Violent Crime Safe Streets Task Force. I have been assigned to this squad since 2011.

3. During the course of my employment as an FBI Special Agent, I have participated in numerous criminal investigations. I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacturing and distribution of controlled substances and weapons. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recording vehicles, audio and audio/video recording devices.

4. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, and street gangs to smuggle and safeguard controlled substances and weapons, to distribute, manufacture, and transport controlled substances, and to collect and launder related proceeds.

5. In addition to the training I received at the FBI Academy, I have received specialized training in narcotics and prison-gang investigations from California state law enforcement agencies. This training has focused on topics such as drug interdiction, drug detection, money-laundering techniques and schemes, drug identification, asset identification and

removal, gang classifications, gang politics, and methods utilized by gangs to carry out the aforementioned criminal conduct.

6. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

7. Because this Affidavit is submitted for the limited purpose of establishing probable cause for the requested arrest warrant, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause.

8. This Affidavit is based upon my own personal knowledge but also the knowledge of other law enforcement officers involved in this investigation. Where I describe statements made by other people (including other special agents and law enforcement officers), the statements are described in sum, substance, and relevant part. Similarly, where I describe information contained in reports and other documents or records in this Affidavit, this information is also described in sum, substance, and relevant part.

## OVERVIEW OF INVESTIGATION

9. The Federal Bureau of Investigation's (FBI's) Safe Streets Gang Task Force (SSTF) has been investigating Sureño and Mexican Mafia gang activity in Northern California. Sureño gangs are loosely-affiliated Mexican-American criminal gangs with a heavy presence in California. Sureño gangs engage in a multitude of criminal acts, but their primary focus is drug trafficking and carrying out orders from the Mexican Mafia. The Mexican Mafia is a highly organized Mexican-American prison gang. The Mexican Mafia is one of the oldest and most powerful prison gangs operating in California and throughout the United States. SEVILLA is a suspected Howe Park Sureño gang member and suspected Mexican Mafia associate.

10. Throughout this application, the below-listed set of terms, created by and commonly used by law enforcement, may be used to describe some of the techniques and tactics used to obtain the probable cause set forth in this Affidavit:

11. Controlled Buy – During a controlled illicit drug or firearm buy, law enforcement officers search a Confidential Source's (CS') vehicle and person before and after the buy. This is done to ensure that no additional money, illicit drugs and/or weapons are taken to the buy or brought back from the buy. During the buy, the CS is generally provided with an audio and/or video recording device to record the transaction and a transmitter to allow law enforcement officers to monitor the transaction and execute a rescue if the

CS' safety is compromised. All of the illicit drug and firearm buys documented in this Affidavit were controlled buys.

12. Staging Area – The term "staging area" refers to the pre-determined location, chosen by law enforcement, to prepare the CS to conduct a controlled buy, and often, return from the buy. At the staging area, the CS is provided with electronic monitoring equipment, buy funds and briefed regarding the objectives of the operation and safety considerations. The CS' vehicle and person are searched for weapons, money, and/or contraband at the staging area.

13. Buy Funds – The term "buy funds" refers to the funds provided by law enforcement to the CS, to successfully conduct the controlled purchase of drugs and/or firearms.

14. This investigation included the use of a CS to conduct controlled methamphetamine and firearm buys. For the purpose of this Affidavit, the CS, referred to as CS-1, was utilized to conduct controlled methamphetamine and firearm buys. CS-1 is characterized below.

15. In early 2016, CS-1 was arrested by the FBI in Sacramento, California on felon in possession of a firearm charges. CS-1's criminal history includes felony convictions for second degree robbery and assault with firearm on a person, and a misdemeanor conviction for prohibited person in possession of ammunition. CS-1 was officially opened as a FBI CS on June 27, 2016. CS-1 was an active Sureño gang member and maintained excellent access to Sureño gang members and Mexican Mafia associates within the Sacramento FBI's area of responsibility. CS-1's primary motivation for working with law enforcement is to reduce his/her criminal exposure on state felon in possession charges. During CS-1's involvement with the FBI, no instances of dishonesty have been identified. CS-1's information has been reliable and often corroborated.

## STATEMENT OF PROBABLE CAUSE

16. On October 25, 2016, CS-1 reported that SEVILLA was using telephone number 916-504-1706 and agreed to sell methamphetamine to CS-1. SEVILLA agreed to meet CS-1 on October 26, 2016.

### October 26, 2016

17. On October 26, 2016, CS-1 conducted a controlled methamphetamine buy from SEVILLA in Sacramento, California. CS-1 recorded telephone contact with SEVILLA at 530-636-5226. SEVILLA then texted that he had the methamphetamine. Prior to departing the staging area, CS-1's person and vehicle were searched for weapons and/or contraband with negative results.

CS-1 was provided with audio and video recording devices, a transmitter, and buy funds. FBI surveillance teams maintained visual observation of CS-1 to and from the buy location.

18. CS-1 arrived at the buy location, 2427 Princeton Street, Sacramento, California (hereinafter, "SEVILLA's Residence".[1] SEVILLA met CS-1 in the driveway of the SEVILLA's Residence. SEVILLA retrieved a brown paper bag from a red truck parked in the driveway. SEVILLA then walked into the garage of the residence. CS-1 followed SEVILLA into the open garage. CS-1 handed SEVILLA $2400. SEVILLA handed CS-1 the brown paper bag, which contained a half pound (approximately 224 grams) of methamphetamine.

19. CS-1 returned to the staging area while under visual observation by the FBI surveillance team. At the staging area, the recording devices, transmitter, and methamphetamine were recovered. CS-1's person and vehicle were searched for weapons and/or contraband with negative results. A field test of the methamphetamine yielded a positive result for the presence of methamphetamine.

20. The FBI submitted the methamphetamine to the DEA's Western Regional Laboratory. The net weight of the methamphetamine was 222.6 grams (g) +/- 0.2 g, and the substance purity was 86% +/- 4%. The amount of pure substance was 191.4 g +/-8.0 g.

**December 1, 2016**

21. On December 1, 2016, CS-1 conducted a second controlled methamphetamine buy from SEVILLA in Sacramento, California. CS-1 recorded telephone contact with SEVILLA at 916-504-1706 and agreed to meet at SEVILLA's Residence. Prior to departing the staging area, CS-1's person and vehicle were searched for weapons and/or contraband with negative results. CS-1 was provided with audio and video recording devices, a transmitter, and buy funds. FBI surveillance teams maintained visual observation of CS-1 to and from the buy location.

22. CS-1 arrived at SEVILLA's Residence. As CS-1 arrived, SEVILLA opened the garage door and invited CS-1 into the garage. SEVILLA then closed the garage door. SEVILLA retrieved a brown paper bag from a microwave in the garage. SEVILLA handed CS-1 the brown paper bag, which contained eight one-ounce bags (approximately 28 grams each bag) of methamphetamine. SEVILLA then asked if CS-1 wanted to weigh the bags of methamphetamine. SEVILLA then retrieved a digital scale from the wooden shelf under the microwave. CS-1 then used the scale to weigh the bags of methamphetamine.

---

[1] Based on statements made by SEVILLA, and observations made during surveillance operations, law enforcement believes that that SEVILLA resides at this residence.

Each bag weighed approximately 1 ounce (28 grams). CS-1 handed SEVILLA $2400.

23. After receiving the $2400, SEVILLA retrieved a 9mm Hi-Point pistol from the wooden shelf under the microwave. SEVILLA displayed the weapon to CS-1. CS-1 then departed SEVILLA's Residence.

24. CS-1 returned to the staging area while under visual observation by the FBI surveillance team. At the staging area, the recording devices, transmitter, and methamphetamine were recovered. CS-1's person and vehicle were searched for weapons and/or contraband with negative results. A field test of the methamphetamine yielded a positive result for the presence of methamphetamine.

25. The FBI submitted the methamphetamine to the DEA's Western Regional Laboratory. The net weight of the methamphetamine was 215.2 grams (g) +/- 0.4 g, and the substance purity was 97% +/- 4%. The amount of pure substance was 208.7 g +/- 7.9 g.

### January 23, 2017

26. On January 23, 2017, CS-1 conducted a controlled firearms buy from SEVILLA in Sacramento, California. CS-1 recorded telephone contact with SEVILLA at 916-504-1706 and agreed to meet at SEVILLA's Residence. SEVILLA agreed to sell an AR-15 rifle to CS-1 for $1400. Prior to departing the staging area, CS-1's person and vehicle were searched for weapons and/or contraband with negative results. CS-1 was provided with audio and video recording devices, a transmitter, and buy funds. FBI surveillance teams maintained visual observation of CS-1 to and from the buy location.

27. CS-1 arrived at SEVILLA's Residence. CS-1 knocked on the front door, and SEVILLA invited CS-1 into SEVILLA's Residence. SEVILLA showed CS-1 to a back bedroom, where the AR-15 was in a black bag lying on a bed. SEVILLA showed CS-1 how to assemble and dissemble the rifle. SEVILLA then placed the rifle in the black bag, after wiping the rifle down for prints. CS-1 handed SEVILLA $1400. CS-1 then exited the residence.

28. CS-1 returned to the staging area while under visual observation by the FBI surveillance team. At the staging area, the recording devices, transmitter, and black bag containing the AR-15 rifle were recovered. Inside the black bag was also a black magazine, containing nine .223 cartridges. CS-1's person and vehicle were searched for weapons and/or contraband with negative results.

29. The AR-15 rifle was a New Frontier, Model LW-15. A NCIC check revealed the weapon was purchased by Juan Angel SUAREZ, 425 Edward Avenue, Manteca, California. A license check conducted by the Bureau of Alcohol,

Tobacco, and Firearms (ATF) confirmed that SEVILLA and SUAREZ do not have a federal firearms license to distribute firearms. New Frontier Armory products are manufactured in Las Vegas, Nevada.

### February 25, 2017

30. On February 25, 2017, CS-1 conducted a controlled firearms buy from SEVILLA in Sacramento, California. CS-1 recorded telephone contact with SEVILLA at 916-504-1706 and agreed to meet at SEVILLA's residence, 2427 Princeton Street, Sacramento, California. SEVILLA agreed to sell an AR-15 rifle to CS-1 for $1300. Prior to departing the staging area, CS-1's person and vehicle were searched for weapons and/or contraband with negative results. CS-1 was provided with audio and video recording devices, a transmitter, and buy funds. FBI surveillance teams maintained visual observation of CS-1 to and from the buy location.

31. CS-1 arrived at SEVILLA's Residence. SEVILLA was observed arriving at SEVILLA's Residence driving a white Chevy Caprice. SEVILLA entered the front door and CS-1 waited outside. SEVILLA opened the garage door and invited CS-1 into the garage. SEVILLA then closed the garage door. SEVILLA showed CS-1 how to operate the rifle. CS-1 handed SEVILLA $1300. SEVILLA also gave CS-1 one magazine and ten cartridges. CS-1 then exited SEVILLA's Residence.

32. CS-1 returned to the staging area while under visual observation by the FBI surveillance team. At the staging area, the recording devices, transmitter, the AR-15 rifle, magazine, and ten .223 cartridges were recovered. CS-1's person and vehicle were searched for weapons and/or contraband with negative results.

33. The AR-15 style rifle had a short barrel, approximately nine inches long. The firearm had no markings, logos, or serial numbers. The ten .223 cartridges were stamped with the marking "LC," which indicates they were manufactured by Lake City in Missouri. A license check conducted by the Bureau of Alcohol, Tobacco, and Firearms (ATF) confirmed that SEVILLA did not have a federal firearms license to distribute firearms.

34. I reviewed SEVILLA's criminal history and learned that in 2006, in the County of Sacramento, SEVILLA was convicted of felony violation of California Penal Code Section 12020(A), Unlawful Carrying and Possession of Weapons, and sentenced to 90 days in jail and five years of probation.

## REQUEST TO SEAL

35. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the law enforcement's ability to search their locations and apprehend them. In light of the on-going nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, your Affiant requests that this Affidavit and the resulting Arrest Warrant be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation. This Affidavit and the accompanying Complaint and Arrest Warrant will be unsealed upon the arrest of SEVILLA.

## CONCLUSION

36. Based on the above-stated facts, there is probable cause to believe that SEVILLA possessed with intent to distribute methamphetamine, a Schedule II controlled substance. Further, based on the above-stated facts, that there is probable cause to believe that on January 23, 2017, SEVILLA possessed a firearm, having previously been convicted of a felony, and did so knowingly. I hereby request that a complaint and arrest warrant be issued for Julio Adrian Jimenez SEVILLA, for a violation of 21 U.S.C. § 841(a)(1) possession with intent to distribute controlled substances and 18 U.S.C. § 922(g) possession of a firearm or ammunition by a prohibited person.

37. I further request that the service of the requested arrest warrant be authorized at any time of the day or night, as I believe, based on my training and experience, that methamphetamine traffickers often operate during the hours of darkness. Furthermore, at this time of year, the sun rises at approximately 5:45 a.m., and execution of the search warrant during daylight hours increases risk of physical harm to the law enforcement officers executing the warrant. This risk is exacerbated in this case, given the propensity for violence and criminal histories of the targets involved in this investigation. Law enforcement does not intend to execute the search warrant any earlier than 5:00 a.m. PT.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

RUSSELL CUSTER
FBI Special Agent

Sworn and Subscribed to me on 5-31-19, 2019,

The Honorable DEBORAH BARNES
United States Magistrate Judge

Approved as to form:

VINCENZA RABENN
Assistant United States Attorney